# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

WILLIAM C. BOND,

          Plaintiff,

          v.

U.S. DEPARTMENT OF JUSTICE, et al.,

          Defendants.

Civil Action 10-01617 (RCL)

## MEMORANDUM OPINION

William C. Bond, proceeding *pro se*, brings this action against the U.S. Department of Justice ("the DOJ") and DOJ officials (collectively "federal defendants"), the Washington Post, and its reporter Manuel Roig-Franzia (collectively "the Post"). With respect to the federal defendants, Bond seeks damages and mandamus relief for violations of his constitutional rights in connection with the federal defendants' failure to investigate matters that Bond referred to the U.S. Attorney for the District of Maryland for prosecution. With respect to the Post, Bond alleges intentional infliction of emotional distress, breach of contract, fraud, negligent misrepresentation, and civil rights violations under the D.C. Criminal Code and the "federal civil rights act," Am. Compl. at 3, as well as negligent supervision stemming from the publication of an article about Bond in the Washington Post's magazine. Bond seeks damages from the Post as well as injunctive relief.

Before the Court are the federal defendants' motion to dismiss or transfer the case [Dkt. #24], the Post's motion to dismiss [Dkt. #10], and Bond's motion for leave to file a second amended complaint [Dkt. #26], as well as Bond's motions to strike portions of the defendants' briefs, which he includes in his opposition filings [Dkt. ##13, 25]. Upon consideration of these

motions, the oppositions thereto, and the record of this case, the Court concludes the defendants'

motions to dismiss must be granted and that Bond's motions to strike and for leave to amend his

complaint a second time must be denied.

## I. BACKGROUND

Bond's complaint[1] represents the latest in a series of attempts to protect both his

reputation and a manuscript that he authored in the early 1990s.[2]  Bond is no stranger to

litigation, and the claims he advances here derive, in part, from suits he has filed and lost in other

federal and state courts.  Because the facts associated with Bond's prior actions are relevant to

the disposition of the present case, the Court retraces the contours of this winding road before

arriving at its conclusion in this Court.

**A.      Bond's Copyright, Conversion, and Invasion of Privacy Actions**

In 2001, Bond brought a copyright infringement action in federal court against parties

who, after allegedly stealing a copy of his manuscript, sought to use it as evidence in a child

---

[1]      In establishing the relevant factual background for this case, the Court considers only the well-pleaded factual allegations set forth in Bond's amended complaint and the exhibits attached to Bond's memoranda insofar as they are incorporated by reference into the complaint. *See Grandison v. Wackenhut Servs., Inc.*, 514 F. Supp. 2d 12, 15 (D.D.C. 2007).  The Court does not rely on other exhibits attached to Bond's memoranda, as reliance on such facts would require the Court to review the present motions under a summary judgment standard.  FED. R. CIV. P. 12(d) ("If, on a motion under Rule 12(b)(6) . . . matters outside the pleadings are presented to and not excluded by the court, the motion must be treated as one for summary judgment under Rule 56."); *Yates v. District of Columbia*, 324 F.3d 724, 725 (D.C. Cir. 2003).

[2]      Bond's manuscript describes the story of a juvenile boy who kills his father. According to Bond, it is a "highly embellished" and "fictionalized" version of his past acts.  Am. Compl. ¶ 1.  When Bond was 17, he beat his father to death with a hammer.  After he was arrested and detained in a juvenile detention facility, he entered into a guilty–plea agreement in juvenile court, was transferred to a Baltimore hospital for psychological treatment, and was released in 1982.  *Bond v. Blum*, 317 F.3d 385, 390 (4th Cir. 2003).  Bond avers in his complaint that the federal defendants have discriminated against him, in part, because of this criminal record.

custody proceeding involving Bond's now-estranged wife and her ex-husband. Both the U.S. District Court for the District of Maryland and the Fourth Circuit Court of Appeals found that this use of the manuscript fell within the "fair use exception" for copyright-protected works. *Bond v. Blum*, 317 F.3d 385, 390–91 (4th Cir. 2003). Then, in Maryland state court, Bond sued various parties associated with the child custody case for conversion of his manuscript and invasion of privacy. These lawsuits were unsuccessful. Am. Compl. ¶¶ 9–10.

Bond now maintains that fraud and unethical conduct mired the state and federal proceedings. Specifically, Bond contends that the individual who stole his manuscript perjured himself and failed to produce properly subpoenaed documents during the state proceedings. Bond also avers that this individual's attorney "instructed [him] to not produce the subpoenaed documents and to not testify truthfully under oath" in the Maryland state court. *Id.* ¶ 12. In addition, Bond alleges that two federal judges who reviewed his case acted unethically by communicating with plaintiff's former counsel and conspiring to deprive Bond of his civil rights.

**B.      Bond's 2004 and 2006 Criminal Referrals to the DOJ**

In an attempt to expose these alleged misdeeds, Bond first referred the matters of perjury and judicial misconduct to the United States Attorney's Office for the District of Maryland ("USAO-MD") in 2004. According to Bond, the Chief of the USAO-MD's criminal division told Bond that "he would be the Government's 'star witness' in their forthcoming prosecution."[3] *Id.* ¶ 19. The Division Chief "was fired" shortly thereafter. *Id.* ¶ 21. In May 2005, the USAO-MD denied Bond's referral in writing, citing "discretion" as a basis for the decision not to investigate. *Id.* ¶ 22. Bond then submitted his referral for reconsideration "in the summer and

---

[3]      The complaint does not specify the subjects of this planned prosecution.

fall of 2006" and was rebuffed yet again. *Id.* ¶ 24. Bond suspected that "illegal discrimination" motivated the refusal to investigate. *Id.* ¶ 25.

Since these denials, Bond has repeatedly complained to the USAO-MD about "crimes committed against his person" and has requested, unsuccessfully, that his complaints be referred to "other DOJ entities." *Id.* ¶ 62. Bond alleges Defendant DOJ officials "including persons known and unknown" have, since 2004 until the present, "acted with callous disregard for Plaintiff and his property and have treated Plaintiff with ill will, spite and hatred because of Plaintiff's juvenile past and the subject matter of his stolen property in question." *Id.* ¶ 71. This failure of DOJ officials to retrieve his property has caused Bond "losses to his reputation, his personal life, his health, and his financial status," as well as "emotional pain and suffering." *Id.*

## C. Bond's FOIA and Fraud Upon the Court Cases and His Collaboration with the Post

In 2007, after his attempts to impel a USAO-MD investigation failed, Bond filed three related actions in federal court: a Freedom of Information Act ("FOIA") complaint against the USAO-MD seeking "to gain the [USAO-MD's] 'final report' of their declined investigation which plaintiff alleged would show illegal discrimination," *id.* ¶ 25, and two complaints alleging "fraud upon the court" by defendants in the copyright case. *Id.* Bond believed the USAO-MD documents could "show illegal discrimination" against him on the part of the DOJ. *Id.* Both the Maryland District Court and the Fourth Circuit dismissed Bond's complaints. *Id.* ¶ 26. Bond sought review of the dismissals by the Supreme Court, filing a petition for a writ of certiorari in late 2008 for the FOIA case and a separate petition in early 2009 for the two "fraud upon the court" cases.

In December 2008, Bond pitched a story about his petitions before the Court to

Washington Post reporter Manuel Roig-Franzia.  In 2001, the Washington Post published a story about Bond that Roig-Franzia had authored without Bond's cooperation.  *Id.* ¶ 29.  Bond now characterizes the 2001 article as "unflattering," *id.* ¶ 19, and "a take-down piece complaining about how Plaintiff was living large as a free man in Maryland." *Id.* ¶ 33.  Nevertheless, Bond discussed with Roig-Franzia a "follow up" story "regarding Plaintiff's looming US [sic] Supreme Court petitions for certiorari," *id.* ¶ 29, that would feature his "legal battle to reclaim his stolen manuscripts . . . complaints of corruption in the Maryland Federal Court and discrimination against his person because of his juvenile record." *Id.* ¶ 33.

Over the ensuing months, Bond and Roig-Franzia met and communicated by telephone and email about the contents of the proposed story.  *Id.* ¶¶ 30–38, 46–47, 49.  According to Bond, at a December 31, 2008 meeting, Roig-Franzia agreed to the following requirements set forth by Bond: "1) that the story was time dependent to be published before the US [sic] Supreme Court set a date to decide whether to grant [Bond's petitions for] certiorari . . . and 2) that whole subjects could not be used for the story." *Id.* ¶ 33.  Moreover, Bond told Roig-Franzia in the same conversation that "anything which encroached upon the subject matters of [Bond's] 'life story' was not to be used in the story and/or was off-the-record." *Id.* ¶ 35.  Bond specified that he "would not cooperate" with any story that "resembled in any way the 2001 story," *id.* ¶ 33, or that featured "the juvenile case or crime, the manuscript and its contents, Plaintiff's mother and other family relations, Plaintiff's wife and present marital discord, Plaintiff's dog, and Plaintiff's finances." *Id.* ¶ 36.  Bond explained to Roig-Franzia that his life story had value and that he wanted to "do something" with it in the future.  *Id.* ¶ 35.  The reporter agreed to these "requirements," *id.* ¶ 37, both at the December 31, 2008 meeting and in a

separate telephone conversation in early January 2009.  Roig-Franzia assured Bond that "he had nothing to worry about with the replication of the 2001 subject matter because that story had already been written."  *Id.* ¶ 34.  After this second exchange, Bond began to cooperate "in earnest" with Roig-Franzia, "giving extensive interviews, supplying experts & [sic] references . . . and agreed for [sic] photographs."  *Id.* ¶ 39.

Bond was eager for the article to be published before the Supreme Court ruled on his petitions.  On several occasions, he urged Roig-Franzia to expedite publication.  *Id.* ¶ 42.  Bond's first petition was denied before publication of the story.  *Id.* ¶ 40.  Bond and Roig-Franzia then spoke and "agreed that the second petition was [Bond's] most important" and that "[t]he story would come out in advance of that conference of the Supreme Court."  *Id.* ¶ 42.  The second petition was also denied before the article's publication.  *Id.* ¶ 43.  After some doubt as to the future of the story, Bond agreed to more interviews and photos "under the continued belief that his legal battle would still be told."  *Id.* at ¶ 47.  According to Bond "there were several conversations where [Roig-Franzia] convinced [Bond] not to pull his approval from the story."  *Id.*

The article appeared in the Washington Post's magazine on May 31, 2009, several months after the Court denied Bond's petitions.  *Id.* ¶ 51.  Bond was "surprised and humiliated" by the article.  *Id.* ¶ 52.  It used "manufactured quotes," *id.* ¶ 56, and off-the-record quotes that Bond had "made only and expressly for 'back story' use for the reporter's own personal understanding of [Bond's] life and cases."  *Id.* ¶ 55.  The article also discussed topics that Roig-Franzia had agreed to exclude, *id.* ¶¶ 52, 55, including quotes from "an Ohio juvenile official" that discussed Bond's juvenile record.  *Id.* ¶ 99.  Thus, according to Bond, the article

"completely recreated the 2001 Washington Post story which the reporter and plaintiff agreed would never happen" during their December 31, 2008 meeting, *id.* ¶ 52, and was not even "remotely close to what [Bond] agreed to cooperate with by the agreement entered into on December 31, 2008 and at all times afterward." *Id.* ¶ 58. Seeking a correct or retraction of the story, Bond contacted the Washington Post's ombudsman "soon after" the May 31, 2009 publication. *Id.* ¶ 59. According to Bond, the ombudsman "agreed such a correction was in order," but the Post took no further action. *Id.* Bond followed up with additional requests for a "supervisory editor" to get involved, but the Post did not respond. *Id.*

Bond now alleges Roig-Franzia breached an "oral contract" as to the content of the story when he included material that he had agreed to exclude. *Id.* ¶ 88. Bond states that he "never knew the reporter intended to renege on his agreement," *id.* ¶ 90, and that Roig-Franzia "knew that he was making a false representation to [Bond] and continued to mislead [him]." *Id.* ¶ 91. Bond also maintains that there are "unknown individuals" at the Post who "are filled with ill will, spite and hatred" toward him and "have taken actual acts to cause harm to [him]." *Id.* ¶ 103. He alleges the Post failed to supervise Roig-Franzia and "to right the wrong committed by the misuse of the newspaper." *Id.* ¶ 102. As a result of the Post's actions, Bond claims that he suffered "a loss in value of his life story, loss to his reputation and standing in his community, loss to his relationships and emotional pain and suffering." *Id.* ¶ 96.

D.     **Bond's 2010 Criminal Referrals to the DOJ**

During his collaboration with Roig-Franzia, Bond sought to intervene in a political corruption case against Thomas L. Bromwell, Sr., a former member of the Maryland Senate. *See United States v. Bromwell*, 222 Fed. Appx. 307, 308 (4th Cir. 2007). Bond believed that certain

sealed documents filed in the prosecution of Bromwell contained negative information about an attorney who had represented Bond's adversaries in his copyright action. For reasons not appearing on the record, this attorney was disqualified from representing parties in *Bromwell*, and Bond sought to unseal documents that contained information about the grounds for his disqualification. The U.S. District Court for the District of Maryland denied Bond's motion to intervene in *Bromwell*, and the U.S. Court of Appeals for the Fourth Circuit affirmed. *United States v. Bromwell*, 377 Fed. Appx. 312, 312 (4th Cir. 2010).

In June and July of 2010, for reasons not presented in the pleadings, Bond had an "informal meeting" with an unnamed federal circuit court judge before whom he had appeared in prior proceedings. Am. Compl. ¶ 63. Bond states that the judge told him that "the US [sic] Attorney for the District of Maryland was fired in 2004, in part, because of Plaintiff's very case . . . ." *Id.* ¶ 67. Bond also maintains that the judge shared information revealing his "exceptionally close relationship" with the district court judge who had denied Bond's request to intervene in the Bromwell case. *Id.* ¶ 81. Subsequently, Bond filed at least one additional criminal referral with the USAO-MD in "late summer 2010," *id.* ¶ 77, alleging "misuse of public office for private gain" by the district judge, *id.* ¶ 78, and a conspiracy among the judges presiding over his past cases and other parties "known and unknown" to "deprive Plaintiff of his civil rights." *Id.* ¶ 83.

Still seeking information about the aforementioned attorney involved in the Bromwell case, Bond also "complained [to the USAO-MD] that the USAO-MD should do something about why the presiding US [sic] District Judge refused to refer the 'disqualified' attorneys to the appropriate Maryland state and federal grievance commissions." *Id.* ¶ 80. Neither the USAO-

MD nor the DOJ responded to this referral. *Id.* ¶ 84. This failure to investigate has caused Bond "embarrassment" and insecurity about "his basic constitutional rights." *Id.* ¶ 86.

**E.    Bond's Claims Before this Court**

Bond filed this action on September 23, 2010, alleging both civil rights violations and tort claims. With respect to the federal defendants, Bond alleges that the DOJ and the named and unnamed DOJ officials violated his civil, due process, and property rights when they failed to investigate his 2005 and 2010 criminal referrals. Bond maintains that "there are unknown individuals at the DOJ who are filled with ill will, spite and hatred toward plaintiff who have refused and who continue to refuse to protect [his] civil rights for political reasons." *Id.* ¶ 85. These officials, Bond contends, have "watched silently while Plaintiff's civil right to due process and his own property have been eviscerated for political and discriminatory reasons." *Id.* ¶ 71. Bond sues these officials under the federal civil rights act (without specifying which exact laws the federal officials have allegedly violated) and states that he is not advancing a claim under the Federal Tort Claims Act ("FTCA"). Pl.'s Opp'n to Fed. Defs.' Mot. to Dismiss ("Pl.'s Opp'n to Fed. Defs.") at 4. Bond seeks economic, non-economic and punitive damages and asks this Court to order the DOJ "to send their agents to each and every person who has or who may have Plaintiff's copyrighted works, impound those works, and return them to Plaintiff," Am. Compl. ¶ 68, "to account for their denial of Plaintiff's right to his property under color of law and other discriminations by ordering an investigation into these matters by the Office of the Inspector General," *id.* ¶ 69, and "to seek restitution on behalf of federal tax payers for monies spent unnecessarily" in connection with the Bromwell case. *Id.* ¶ 82. Bond also asks this Court to

order the DOJ's Office of Inspector General to "investigate judicial corruption and why the Defendant DOJ officers refused to do their job." *Id.* ¶¶ 71, 87.[4]

With respect to the Post, Bond alleges fraud, intentional infliction of emotional distress, and breach of contract as well as civil rights violations under D.C. Criminal Code § 22-3221, the common law, and the "federal civil rights act." Pl.'s Opp'n to Fed. Defs. at 4.[5] Bond also claims that Roig-Franzia, acting with malice, Am. Compl. ¶ 96, breached an oral contract that delineated the contents of the story, *id.* at ¶ 58, stole his "life story", *id.* ¶ 55, and "repeatedly invad[ed] Plaintiff's 'confidential' Ohio juvenile record . . . ." *Id.* ¶ 99. Finally, he alleges that Roig-Franzia "intentionally circumvented the Post's safeguards to prevent rogue reporters from misusing the paper's vast powers . . . ." *Id.* ¶ 100. At the same time, Bond alleges that the Post was negligent in its supervision of Roig-Franzia, *id.* ¶ 102, and in its failure to "right the wrong committed by the misuse of their [sic] paper." *Id.* From the Post, Bond seeks economic, non-economic and punitive damages, *id.* ¶ 101, as well as the return of photographs, copyright ownership over the published story, "a prominent story about his legal fight in the Washington Post and/or the value of such a story." Pl.'s Opp'n to Washington Post and Manuel Roig-Franzia's Mot. Dismiss ("Pl.'s Opp'n to Post.") at 16.

---

[4]     Bond scales back his request for relief in his opposition to federal defendant's motion to dismiss. In his memorandum, he states that "the only relief plaintiff is asking of this Court is for the Court to order the DOJ's Office of Inspector General to investigate Plaintiff's allegations in Counts I & III of his Amended Complaints." Pl.'s Opp'n to Fed. Defs. at 12. To ensure resolution of his claims, however, this Court considers all prayers for relief that Bond requests in his amended complaint, including those for money damages.

[5]     In his amended complaint, Bond does not explicitly state that he is suing the Post for defamation. However, his allegations—for instance, that certain content in the article was false and that he suffered harm to his reputation—as well as his response to defendants' motion to dismiss, suggest he advances such a claim. In its motion to dismiss and reply brief, the Post assumed and responded to a defamation claim. The Court therefore construes such a claim against the Post from the facts asserted in Bond's amended complaint.

The Post and the federal defendants have moved separately to dismiss Bond's amended complaint. Federal defendants move for dismissal under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6), and, in the alternative, 12(b)(3). The Post moves for dismissal under Rule 12(b)(6).

Bond seeks leave to amend his complaint to join five DOJ officials (Rod J. Rosenstein, "Unknown officials for the DOJ," Allen F. Loucks, Barbara S. Sale, "Unknown AUSA MD No. 1 a.k.a. 'the Piranha,'" and "Unknown AUSA No. 2") as well as "unknown officials of the DOJ." Second Am. Compl. at 1–2. In two paragraphs of his proposed second amended complaint, Bond proposes to substitute "Defendant DOJ Officials" for "the DOJ." *Id.* ¶¶ 71, 87. He proposes no amendments to his claims against the Post. In addition to moving to dismiss his amended complaint, both defendants oppose Bond's motion to amend his complaint. After discussing legal standards applicable to this case, the Court considers, in turn, Bond's motions to strike portions of defendants' memoranda, defendants' motions to dismiss Bond's complaint, and finally, Bond's motion to amend his complaint a second time.

## II. LEGAL STANDARDS

### A. Subject Matter Jurisdiction

Rule 12(b)(1) addresses a court's subject matter jurisdiction to adjudicate a case. Because this inquiry deals with a court's power to hear a plaintiff's claim, a Rule 12(b)(1) motion imposes on the Court an affirmative obligation to ensure that it is acting within the scope of its authority. *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13 (D.D.C. 2001) (citing 5A CHARLES A. WRIGHT & ARTHUR R. MILLER, FED. PRAC. & PROC. CIV. 2D § 1350). "The plaintiff bears the burden of establishing that the court has jurisdiction."

*White v. United States*, 791 F. Supp. 2d 156, 159 (D.D.C ,2011) (quoting *Grand Lodge of Fraternal Order of Police*, 185 F. Supp. 2d at 13).

In deciding a Rule 12(b)(1) motion, a court need not limit itself to the allegations of the complaint. *Hohri v. United States*, 782 F.2d 227, 241 (D.C. Cir. 1986), *vacated on other grounds,* 482 U.S. 64 (1987). Rather, "a court may consider such materials outside the pleadings as it deems appropriate to resolve the question [sic] whether it has jurisdiction in the case." *Scolaro v. D.C. Bd. of Elections and Ethics*, 104 F. Supp. 2d 18, 22 (D.D.C. 2000) (citing *Herbert v. Nat'l Acad. of Scis.*, 974 F.2d 192, 197 (D.C. Cir. 1992)); *see also Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).

## B.      Failure to State a Claim

When reviewing a motion to dismiss pursuant to Rule 12(b)(6), a court must accept as true all factual allegations contained in the complaint, and the plaintiff should receive the benefit of all favorable inferences that can be drawn from the facts alleged. *See Equal Em't Opportunity Comm'n v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 n.3 (D.C. Cir. 1997).

The Federal Rules of Civil Procedure require only that a complaint contain "'a short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A plaintiff must set forth in the complaint "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1940 (2009) (quoting *Twombly*, 550 U.S. at 570). "[C]ontent that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged" meets this plausibility

requirement. *Id* at 1949. Although "detailed factual allegations" are not necessary to survive a Rule 12(b)(6) motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Twombly*, 550 U.S. at 555. A complaint does not suffice "if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 557).

The notice pleading rules are not meant to impose a great burden on a plaintiff. *See Dura Pharm., Inc. v. Broudo*, 544 U.S. 336, 347 (2005); *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512–13 (2002). Courts have an obligation to construe liberally the filings of *pro se* plaintiffs. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (reaffirming the principle that a plaintiff proceeding *pro se* may expect that his complaint, "however inartfully pleaded, [will] be held to less stringent standards than formal pleadings drafted by lawyers")*; accord Toolasprashad v. Bureau of Prisons*, 286 F.3d 576, 583 (D.C. Cir. 2002). At the same time, "the court need not accept inferences drawn by plaintiffs if such inferences are unsupported by the allegations set out in the complaint. Nor must the court accept legal conclusions cast in the form of factual allegations." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994).

## C.     Leave to File a Second Amended Complaint

A plaintiff may amend the complaint a second time "only with the opposing party's written consent or the court's leave. The court should freely give leave when justice so requires." FED. R. CIV. P. 15(a)(2). A court should grant leave to amend "in the absence of undue delay, bad faith, undue prejudice to the opposing party, repeated failure to cure deficiencies or futility." *Richardson v. United Sates*, 193 F.3d 545, 548–49 (D.C. Cir. 1999) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)). "The party opposing amendment has the

burden of establishing that it would be improper." *Patton Boggs, LLP v. Chevron Corp.* 791 F.

Supp. 2d 13, 19 (D.D.C. 2011) (citing *Nwachukwu v. Karl*, 222 F.R.D. 208, 211 (D.D.C. 2004)).

An amended complaint is futile "if it merely restates the same facts as the original

complaint . . . fails to state a legal theory or could not withstand a motion to dismiss." *Robinson*

*v. Detroit News, Inc.*, 211 F. Supp. 2d 101, 114 (D.D.C. 2002) (citing 3 MOORE'S FED. PRAC.

§15.15[3] (3d ed. 2000)); *accord In re Interbank Funding Corp. Secs. Litig.*, 629 F.3d 213, 215

(D.C. Cir. 2010). Accordingly, the Court applies the Rule 12(b)(1) and 12(b)(6) standards for

dismissal to plaintiff's motion to amend. *See White*, 791 F. Supp. at 159–60

### III. ANALYSIS

After addressing Bond's motions to strike portions of the defendants' briefs, the Court

considers the defendants' motions to dismiss and Bond's motion for leave to file a second

amended complaint.

### A. The Court Denies Bond's Motions to Strike Portions of Defendants' Memoranda

Bond asks the Court to strike parts of the defendants' filings, alleging that certain content

is prejudicial, inaccurate, and a mischaracterization of his pleadings. With respect to the Post,

Bond asserts that its motion to dismiss contains numerous "misstatements of fact" regarding

assertions in Bond's amended complaint. Pl.'s Opp'n to Post at 4. Indeed, Bond claims the

inaccuracies are "so numerous" that the Court should "strike all statements made in the

Defendants' filing which correspond to a specific paragraph in the Plaintiff's Complaint." *Id.*

To justify this sweeping request, Bond points to material which, he believes, will prejudice the

Court: the Post's discussion of Bond's letterhead and its attachment of the May 31, 2009 article

to its motion to dismiss. Bond also avers that the Post incorrectly stated that Bond was

proceeding *pro se* in a prior action in which he was, in fact, represented by counsel.

With respect to the federal defendants, Bond moves to strike four specific sections of their motion to dismiss: (1) footnotes describing the content of his manuscript and his correspondence with his father-in-law, which Bond claims is irrelevant; (2) an alleged mischaracterization of the relationship between Bond's copyright case and the Maryland state court custody case involving his wife and her ex-husband; (3) a misstatement that Bond appeared *pro se* in a Maryland state court lawsuit when he was represented by counsel; and (4) an alleged misquotation of a 2007 U.S. district court dismissal of one of Bond's past actions. Both defendants counter that Bond has not shown that the content at issue is so egregious as to warrant striking. The defendants' arguments are well-taken.

Under Federal Rule of Civil Procedure 12(f), a court may "strike from a pleading any redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f).[6] Movants bear the burden of showing a motion to strike is justified. *Nwachukwu*, 216 F.R.D. at 178. A court will "draw all reasonable inferences in the pleader's favor and resolve all doubts in favor of denying the motion to strike." *Id.* Here, Bond has not met this burden. His assertions do not establish grounds for striking portions of either defendant's brief. With respect to the Post's filing, Bond has merely pointed to valid arguments on the part of his adversary, not to "redundant, immaterial, impertinent, or scandalous matter." FED. R. CIV. P. 12(f). In its motion

---

[6] For purposes of this motion, the Court will assume that Rule 12(f) applies to motions, which are not "pleadings" under Rule 7(a). *See* BLACK'S LAW DICTIONARY (9th ed. 2009) (defining "pleading" as "[a] formal document in which a party to a legal proceeding (esp. a civil lawsuit) sets forth or responds to allegations, claims, denials, or defenses. In federal civil procedure, the main pleadings are the plaintiff's complaint and the defendant's answer."). *See Patton Boggs*, 791 F. Supp. at 22 n.5 (D.D.C. 2011) (making same assumption in evaluating plaintiff's motion to strike defendant's motion to dismiss).

to dismiss, the Post correctly quotes Bond's complaint and argues that it fails to state a claim. Far from impertinent, this type of argumentation is fundamental to the adversarial process. As to the alleged misstatement of fact as to Bond's *pro se* status, the Post acknowledged and corrected this error in its reply brief, mooting any need for Court correction.

For similar reasons, to the extent the federal defendants' memorandum contains background information and misstatements of fact, the Court finds they do not meet the Rule 12(f) standard in several respects. First, however unflattering the cited facts about Bond's past may be, this information provides context to his history of litigation and the basis on which he claims to be discriminated against, both of which relate to his complaint.[7] *See Patton Boggs*, 791 F. Supp. at 22 ("[I]t is routine for parties to provide the Court with a certain amount of background information that is not directly relevant to the merits of the claim or motion at issue. This practice ensures that the Court understands the context in which the dispute arose."). Second, even if the DOJ mischaracterized the sequencing of Bond's copyright and child custody cases, the actions are in fact related, *see Bond*, 317 F.3d at 389–390, and any errors as to their relative timing or Bond's *pro se* status in other cases do not warrant striking. Similarly, the DOJ's quotation of the 2007 district court opinion, while inaccurate, does not require this Court to strike the content at issue. The DOJ asserted in its brief that Bond's action was dismissed on grounds that it was "factually and legally frivolous." Fed. Defs.' Mot. To Dismiss at 5. In

---

[7] While the Court is critical of defendants' errors, it also notes that Bond does not move to strike defendants' memoranda with clean hands. His filings contain frivolous and irrelevant information about Roig-Franzia, *see, e.g.*, Am. Compl. ¶¶ 55, 60, that has no bearing on the merits of this case. This fact alone militates against granting his motions. *See Patton Boggs*, 791 F. Supp. at 22 (denying a motion to strike, in part, because the moving party also presented "prodigious amounts of background information that was largely irrelevant . . . [and] intended primarily to cast the other party in a negative light").

relevant part, the actual opinion states that the Court, in considering Bond's motion, has "the discretion to dismiss a case . . . if it determines that the action is factually or legally frivolous. The court finds that the instant matter is subject to dismissal." *Bond v. Blum*, 2007 WL 5921363, at *2 (D. Md. June 26, 2007). Thus, while the court did not explicitly find Bond's motion to be "factually and legally frivolous," its holding rests on one or both of these grounds as a basis for dismissing Bond's action. In light of these facts, the Court finds that federal defendants' misquotation does not reach the Rule 12(f) threshold for striking the material at issue. Accordingly, the Court denies Bond's motions to strike portions of defendants' memoranda and turns to defendants' motions to dismiss and Bond's motion for leave to amend his complaint a second time.

## B.    Bond's Claims Against Federal Defendants

Bond alleges in his amended complaint that the DOJ violated his constitutional rights to property and due process when it failed to investigate the crimes and misdeeds referred to the USAO-MD. In his second amended complaint, Bond proposes to name individual DOJ officials as defendants. For the reasons stated below, the Court agrees with federal defendants that Bond's amended compliant fails to establish subject matter jurisdiction and to state a claim upon which relief can be granted. Further, Bond's proposed amendments to his complaint are futile, and should therefore be denied.[8]

---

[8]    Federal defendants, citing 28 U.S.C. § 1391(e), maintain that venue is necessarily improper in this district because a substantial part of the events or omissions that gave rise to Bond's claim did not occur here and because Bond does not reside in the District of Columbia. This application of § 1391(e) is incorrect. Section 1391(e) states that venue is proper for claims against federal defendants (including officials sued in their official capacities) in judicial districts where: "(1) a defendant in the action resides, (2) a substantial part of the events or omissions giving rise to the a claim occurred . . . , *or* (3) the plaintiff resides." 28 U.S.C. § 1391(e) (emphasis added). In this case, the first basis for proper venue—i.e. section 1391(e)(1)—is

1.      **The DOJ and DOJ Officials Acting in their Official Capacity are Immune from Bond's Claims for Money Damages**

Bond seeks money damages for the harm he allegedly suffered as a consequence of the federal defendants' failure to retrieve the manuscript that was stolen from him and to investigate fraud in the judicial system that tainted his prior cases.  The federal defendants contend that sovereign immunity bars Bond's claims for money damages against the DOJ and officers acting in their official capacity.  Accordingly, the federal defendants argue, these claims must be dismissed for lack of subject matter jurisdiction.  The Court agrees with the federal defendants.

Under the doctrine of sovereign immunity, the United States and its agencies are immune from suit for money damages unless Congress explicitly waives this immunity.  *See United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Jones v. Yanta*, 610 F. Supp. 2d 34, 41–42 (D.D.C. 2009) (citing *FDIC v. Meyer*, 510 U.S. 471, 477 (1994)); *Epps v. Howes*, 573 F. Supp. 2d 180, 186 (D.D.C. 2008).  Thus, in the absence of a waiver of sovereign immunity, the Court lacks

---

satisfied because the DOJ and its officers, when sued in their official capacities, reside in this district for purposes of venue.  *See Lamont v. Haig*, 590 F.2d 1124, 1128 (D.C. Cir. 1978).  As well, federal defendants' reliance on *Hemmings v. United States*, 373 Fed. Appx. 82 (D.C. Cir. 2010) is unfounded.  That case dealt with 28 U.S.C. § 1392(b), an entirely separate venue provision.  Although federal defendants have not argued as much, venue may be improper as to Bond's claims against DOJ officers sued in their individual capacities, as section 1392(b) applies in such contexts, *see Lamont*, 590 F.2d at 1130 n.36 (interpreting 28 U.S.C. § 1391(e) to require that "a plaintiff . . . who sues both a federal and a nonfederal defendant who participated in the activity undergirding the lawsuit must press his claim in a district having venue with respect to the nonfederal defendant by authority other than § 1391(e)"), and it is not clear from the facts whether the named individual defendants reside in the District of Columbia.  Nevertheless, the Court declines to rule on this matter.  Even if venue is improper, the Court will resolve this case on the merits in the interest of avoiding frivolous refiling in other districts.  *See Cameron v. Thornburgh*, 983 F.2d 253, 256 (D.C. Cir. 1993) (dismissing an action brought under *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971) for failure to state a claim rather than improper venue in order to "expeditiously . . . weed out" insubstantial *Bivens* actions and because transfer to another district would not be in the interest of justice) (quoting *Siegert v. Gilley*, 500 U.S. 226, 232 (1991)).

jurisdiction over Bond's claims against federal defendants for monetary damages. *See FDIC*, 510 U.S. at 475 (citing *United States v. Sherwood,* 312 U.S. 584, 586 (1941)). Here, no such waiver exists as "Congress has not waived immunity for suits seeking monetary damages that arise under the Constitution." *Scinto v. Fed. Bureau of Prisons*, 608 F. Supp. 2d 4, 9 (D.D.C. 2009) (dismissing action against federal agency for lack of jurisdiction on the basis of sovereign immunity) (internal citations omitted). Thus, DOJ's immunity precludes Bond's claims for damages.[9]

Bond's claims against DOJ officials acting in their official capacity fare no better. Actions against federal officials in their official capacity are treated as suits against their employer. *See Clark v. Library of Cong.*, 750 F.2d 89, 103 (D.C. Cir. 1984) (finding that, as in suits against federal agencies, sovereign immunity "bar[s] suits for money damages against officers in their official capacity absent a specific waiver by the government."); *Fletcher v.*

---

[9]  As federal defendants note, Bond's claims for money damages against the DOJ and its officials arising before September 23, 2007 are also time-barred even when subject to the most generous statute of limitations that could apply to his unspecified constitutional claims, *see Bame v. Clark*, 466 F. Supp. 2d 105 (D.D.C. 2006) (applying the same limitations period to similarly unspecified *Bivens* claims). Because Bond alleges harm in the form of federal defendants' failure to investigate his referrals, the statute of limitations accrued in 2005 and 2006 when he received the letters from the USAO-MD declining to investigate—indeed, he alleged in a separate 2007 suit that the DOJ's declination amounted to "illegal discrimination." Am. Compl. ¶ 25. That Bond "had no proof" of reasons for the AUSA's 2005 resignation, which, he alleges, is tied to the failure of USAO-MD to investigate in 2005, is inapposite to the accrual inquiry. Likewise, to the extent Bond alleges an ongoing conspiracy to deprive him of his rights, such a theory of liability does not clear the time bar. Overt acts committed outside the statutory period are not actionable, absent fraudulent concealment. *Lewis v. Bayh*, 577 F. Supp. 2d 47, 53 (D.D.C. 2008) (quoting *Lawrence v. Acree*, 665 F.2d 1319, 1324 (D.C. Cir. 1981)). This bar applies even if such acts are part of the same conspiracy that included an overt act within the statute of limitations period. *Lewis*, 577 F. Supp. 2d at 53. Since Bond does not plead fraudulent concealment (the 2005 and 2006 letters were mailed to him and explicitly stated the USAO-MD's disposition), the statute of limitations period lapsed three years after he received those letters.

*District of Columbia*, 481 F. Supp. 2d 156, 162 (D.D.C. 2007).  Bond cannot overcome the sovereign immunity bar by simply naming officials and employees of the United States as defendants.  *See Gilbert v. DaGrossa*, 756 F.2d 1455, 1458 (9th Cir. 1985).  For these reasons, sovereign immunity renders consideration of Bond's claims for damages against both the DOJ and its officers acting in their official capacity outside this Court's jurisdiction.[10]

2.      **Bond Is Not Entitled to Mandamus or Injunctive Relief**

Bond's request for a court-ordered retrieval of his "stolen manuscript" and an investigation by the DOJ and/or the DOJ's Office of the Inspector General is, in effect, a request for a writ of mandamus.  Bond contends that such actions are needed to return his property to him and to root out corruption in the judicial system and the DOJ.  Federal defendants assert, rightly, that Bond fails to state a claim.

Available only in "extraordinary situations" and at the discretion of the court, writs of mandamus compelling agency action are "hardly ever granted."  *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005).[11]  To survive a motion to dismiss, a plaintiff seeking a writ of mandamus must plead facts that, when accepted as true, show he has a "clear and indisputable" right to relief, *Gulfstream Aerospace Corp. v. Mayacamas Corp.*, 485 U.S. 271, 289 (1988), that he has exhausted all other avenues of relief, and that the defendant has a nondiscretionary duty to act.

---

[10]      The FTCA is the exclusive federal cause of action against the federal government for money damages.  As noted above, Bond states in his opposition filings that he is not bringing an FTCA action.  Even if Bond were to make an FTCA claim, he would not prevail because he has failed to exhaust his available administrative remedies.  *See* 28 U.S.C. § 2675; *Banks v. Lappin*, 539 F. Supp. 2d 338, 240 (D.D.C. 2008).

[11]      The Mandamus Act, which codified the common-law writ of mandamus, confers jurisdiction on the district courts over actions "in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."  28 U.S.C. § 1361; *see also Heckler v. Ringer*, 466 U.S. 602, 616 (1985) (discussing and applying the Mandamus Act).

*Heckler* 466 U.S. at 616.

Here, Bond's claims fail to show he is clearly and indisputably entitled to the extraordinary relief he seeks. "A private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another." *Linda R.S. v. Richard D.*, 410 U.S. 614, 619 (1973). Thus, to the extent Bond seeks to compel criminal investigations, he fails to state a claim upon which relief can be granted. Insofar as Bond seeks to compel investigations of the DOJ (i.e. by the department's Inspector General), his claim cannot withstand a motion to dismiss as this Court has established that "[t]here is . . . no such thing as a due process right to an investigation by the Department of Justice's Inspector General." *Futch v. Fine*, 2009 WL 565616, at *1 (D.D.C. Mar. 5, 2009), *aff'd* 342 Fed. Appx. 638 (D.C. Cir. 2009).

Other mandamus or injunctive relief in the form of agency-forcing orders is also outside of Bond's scope of entitlement. The decision to investigate any particular referral lies, by definition, within the discretion of any Inspector General or prosecutor, and "a writ of mandamus is not available to compel discretionary acts." *Cox v. Sec'y of Labor*, 739 F. Supp. 28, 30 (D.D.C. 1990) (finding no right to compel Department of Labor investigation); *see also Haenichen v. Reno*, 26 Fed. Appx. 34, 35 (2d. Cir. 2001) ("An individual may not compel officials at the Department of Justice to initiate an investigation concerning the alleged criminal acts of another.") (citing *Linda R.S.*, 410 U.S. at 619); *Lovoi v. Department of Justice*, 679 F. Supp. 2d 12, 14 (D.D.C. 2010) (citing *Cox* and finding no right to an FBI investigation). The Court therefore concludes that Bond has failed to state a claim against federal defendants for injunctive or mandamus relief.

4.      **The Court Denies Bond's Motion to Amend His Complaint With Respect to the Federal Defendants**

In his proposed second amended complaint, Bond adds to his jurisdiction and venue statement a sentence that he is filing a "civil action against officials of and/or the United States Department of Justice brought under the civil rights law of the United States i.e. *Bivens v. Six Unknown Names Agents of Federal Bureau of Narcotics* 403 U.S. 388 (1971) . . . ."  The amendment also names individual DOJ officials and substitutes "DOJ Officials" for "DOJ" in sections where Bond alleges the federal defendants violated his constitutional rights and conspired to deprive him of these rights.  *See* Second Am. Compl. ¶¶ 78, 81.  While not explicitly stated in his proposed amended complaint, Bond's intent to sue DOJ officials acting in their individual as well as official capacity is apparent from his naming of these officials and his invocation of *Bivens*.[12]  In light of Bond's *pro se* status, the Court considers this individual capacity claim, even though it is "inartfully pleaded."  *See Erickson*, 551 U.S. at 94.  Nevertheless, the Court finds that the proposed amendments are unable to withstand a motion to dismiss and therefore futile.  *See Robinson*, 211 F. Supp. 2d at 114.

To state a cognizable *Bivens* claim against federal officials acting in their individual capacities, Bond must plead facts that, when accepted as true, show he is entitled to relief for a violation of his constitutional rights in which the named defendants were personally involved.

---

[12]      Federal defendants do not address Bond's individual capacity claim against the named DOJ officials maintaining that he attempts to sue the listed officials in their official capacity only.  *See* Fed. Defs.' Opp'n to Pl.'s. Mot. for Leave to File Second. Am. Compl. at 2.  Defendants objecting to motions to file leave to amend bear the burden of showing futility, *Patton Boggs*, 791 F. Supp. at 19, and federal defendants have failed to do so in their opposition brief.  However, because the Court applies a more liberal pleading standard to Bond's complaint and therefore considers assertions made in Bond's opposition filing, defendants' failure to address the individual capacity assertion is treated with an accordant level of lenience here.  In its discretion, the Court will address the new individual capacity claim sua sponte.

*See Simpkins v. District of Columbia*, 108 F.3d 366, 369 (D.C. Cir. 1997) ("The complaint must at least allege that the defendant federal official was personally involved in the illegal conduct."), *cf. Cameron v. Thornburgh*, 983 F.2d 253, 258 (D.C. Cir. 1993) ("In the absence of any allegations specifying the involvement of [individual officer-defendants] in this case, the claims against them are based on nothing more than a theory of respondeat superior, which of course cannot be used in a Bivens action.").

In his proposed amended complaint, Bond fails to meet these pleading requirements. For the reasons stated above, Bond has no right to a DOJ or Inspector General investigation of the transgressions he alleges. To the extent he alleges other harmful actions by the listed DOJ officials, Bond fails to allege specific acts that amount to constitutional rights violations. Referring to the individuals in the aggregate (i.e. "DOJ officials"), Bond names them only in the title page of his proposed second amended complaint and avers that from 2004 to 2009, DOJ officials "watched" as the judges before whom he appeared in Maryland deprived him of his due process and property rights. Second Am. Compl at 1, ¶ 71. The alleged facts do not describe the named officials' personal involvement in any rights violations much less how they agreed to or acted in pursuance of the alleged conspiracy. The absence of these required facts is fatal to Bond's claim. *See Voinche v. Obama*, 744 F. Supp. 2d 165, 176 (D.D.C. 2010) ("[I]f plaintiff is asserting a claim for constitutional violations he should do so with the requisite specificity, so as to give defendants notice, plead the involvement of each defendant and clarify what constitutional right has been violated.") (citing *Jarrell v. Tisch*, 656 F. Supp. 237, 239 (D.D.C. 1987)).

Even a liberal reading of his filings cannot save Bond's claims against the DOJ officials.

Bond alleges a conspiracy in his opposition to the federal defendants' motion to dismiss (but not in his complaint or proposed amendment), maintaining that DOJ's passivity was part of an "express or implied agreement among Federal officials to deprive plaintiff of his constitutional rights," Pl.'s Opp'n to Fed Defs. at 6, and led to "an actual deprivation of those rights resulting from the agreement." *Id*. As with the allegations in his complaint, these assertions fail to describe how the individual officials deprived him of his rights or conspired to do so. As a result, they cannot withstand a motion to dismiss. *See Merriweather v. Lappin*, 710 F. Supp. 2d 149, 151–152 (D.D.C. 2010) (finding complaint alleging Eighth Amendment violations under *Bivens* failed to state a claim when it alleged only that federal defendants "knew" or were "on notice" of the allegedly unconstitutional medical treatment recommendation and holding that "[i]n the absence of more specific fact-based allegations establishing how [defendant] allegedly 'knew' of the alleged treatment recommendations, and his personal involvement in denying medically recommended treatment, such vague and conclusory allegations do not 'state a claim for relief that is plausible on its face.'") (citing *Twombly*, 550 U.S. at 570).

Thus, similar to the allegations advanced in Bond's complaint and proposed amendments, the conclusory statements made in Bond's proposed second amended complaint and opposition memoranda provide no "content that allows the court to draw the reasonable inference that the defendant[s] [are] liable for the misconduct alleged." *Iqbal*, 129 S. Ct. at 1949. While the cursory addition of individually named officers may skirt the sovereign immunity bar, they cannot survive a motion to dismiss and are therefore futile. The Court therefore denies Bond's motion to join by amendment DOJ officials acting in their individual capacity.

## C.     Bond's Claims Against Roig-Franzia and the Washington Post

Bond alleges in his amended complaint that the Post is liable for a variety of torts and civil rights violations.  His second amended complaint changes none of these claims.  For the reasons stated below, the Court agrees with the Post that Bond's amended compliant fails to state a claim upon which relief can be granted and that his proposed amended complaint is futile.

### 1.     Bond's Claims for Defamation and Intentional Infliction of Emotional Distress are Time-Barred

Bond maintains that the Post defamed and intentionally caused him emotional distress when it misquoted a portion of a brief he filed in a prior proceeding as well as the title of his manuscript.[13]  The Post counters that these claims are time-barred and that, even if they were not, Bond fails to plead essential elements of defamation and intentional infliction of emotional distress (IIED).  The Court agrees with the Post that Bond's claims for defamation and IIED are time-barred.  Furthermore, Bond's attempts to resuscitate his claims with tolling and lulling arguments are unavailing.

Under District of Columbia of law, which applies to this diversity action, the statute of limitations for defamation claims is one year.  *See* D.C. Code § 12-301(4)*; Jovanovic v. U.S.-Algeria Bus. Council*, 561 F. Supp. 2d 103, 111 (D.D.C. 2008).  Moreover, by the

---

[13]     Bond also alleges that the Post libeled him in other parts of the May 31, 2009 article, including quotes from other interviewees and descriptions of Bond's lifestyle.  Bond has not alleged that any of this material is false.  Because falsity is a requirement of any defamation claim, *see Howard Univ. v. Wilkins*, 22 A.3d 774, 785 (D.C. 2011), the Court rejects these arguments as meritless.  Bond also claims in his opposition to the Post's motion to dismiss that the Post cast him in a "false light."  However, Bond pleads no facts to substantiate a false light invasion of privacy claim which, by definition, requires falsity.  *See Jankovic v. Int'l Crisis Grp.*, 494 F.3d 1080, 1092 (D.C. Cir. 2007) (citing RESTATEMENT (SECOND) OF TORTS § 652E).  Even if Bond plead falsity, his claim would be subject to the same time bar that forecloses his other allegations of reputational harm, as discussed in this section.

"intertwining doctrine," torts such as IIED that are "completely dependent on or essentially the same as [a defamation claim], and cannot survive as a separate, independent cause of action" are subject to the same one-year time bar.  *Jovanovic*, 561 F. Supp. 2d at 113 (internal citation omitted); *see also Browning v. Clinton*, 292 F.3d 235, 244 (D.C. Cir. 2002) (applying intertwining doctrine to bar IIED claims); *Thomas v. News World Commc'ns*, 681 F. Supp. 55, 73 (D.D.C. 1988) (finding plaintiff's claim against news source for IIED intertwined with defamation claims and was therefore subject to the one-year time bar under D.C. Code § 12-301(4) when the claim arose from the same article and set of facts and allegations that underlay plaintiff's defamation claim).  Here, because Bond's IIED claim stems directly from the harm to his reputation and emotional state that the alleged defamation caused, it is subject to the one-year limitations period.

As for the date of accrual, in the District of Columbia, the single publication rule applies, whereby the date of accrual for a libel claim is the date of publication.  *Mullin v. Wash. Free Weekly, Inc.*, 785 A.2d 296, 297 (D.C. 2001).  This rule applies even if third parties replicate the allegedly libelous material on the Internet.  *See Jankovic*, 494 F.3d at 1087 (citing Restatement (Second) of Torts § 577A for the proposition that "in the print media world, the copying of an article by the reader—even for wide distribution—does not constitute a new publication" and concluding that "the equivalent occurrence should be treated no differently on the Internet.").  Thus, the limitations period for Bond's libel claim began to run on May 31, 2009, the date of the article's publication, and did not reset with any subsequent publication.[14]

_____

[14]        As noted above, although Bond does not explicitly assert a defamation claim in his complaint, he does so in his subsequent filings.  The Court therefore applies this statute of limitations and the accordant intertwining doctrine to his IIED claims.  Even if it were not subject to the one-year time bar, his intentional tort claim fails on the merits because Bond fails

Bond's argument that the limitations period was tolled as a result of his correspondence with the Post is similarly unconvincing. The doctrine of lulling applies when the defendant "ha[s] done something that amounted to an affirmative inducement to plaintiffs to delay bringing action." *Jankovic*, 494 F.3d at 1086 (quoting *Bailey v. Greenberg*, 516 A.2d 934, 937 (D.C. 1986) (citations omitted). Such inducement may exist when, for example, a defendant promises to settle a dispute outside of court only to delay plaintiff's filing beyond the limitations period. *See, e.g.*, *East v. Graphic Arts Indus. Joint Pension Trust*, 718 A.2d 153, 156–57 (D.C. 1998); *Bailey*, 516 A.2d at 939. Because the inducement must be affirmative, "inaction" does not suffice, *Jankovic*, 494 F.3d at 1086, nor does "mere silence." *William J. Davis, Inc. v. Young*, 412 A.2d 1187, 1192 (D.C. 1980). Bond claims that the Post's ombudsman responded to Bond's requests with an acknowledgment that "a correction was in order." Am. Compl. ¶ 59. However, Bond presents no facts suggesting that the ombudsman, Roig-Franzia, or any other Post representative committed to taking action. Indeed, the opposite appears to have occurred. In response to Bond's alleged request for a supervisory editor to "get involved" after Roig-Franzia did not act, Bond heard nothing from neither ombudsman nor the Post. *Id.* No facts in Bond's complaint suggest the Post induced Bond to delay bringing the action now before this Court. The Court therefore finds that Bond's defamation and IIED claims are time-barred. It next turns to Bond's breach of contract claim.

### 2. The Court Finds No Enforceable Oral Contract

Liberally construing Bond's *pro se* complaint, the Court understands Bond to claim that

---

to allege "extreme and outrageous" acts on the part of Roig-Franzia, an essential element of any IIED claim. *Steele v. Isikoff*, 130 F. Supp. 2d 23, 35 (D.D.C. 2000). On the facts alleged, Roig-Franzia may have misquoted Bond, but this behavior does not rise to the level of misconduct that recovery under an IIED theory requires.

an oral contract existed between him and the Post which included at least the following four terms: (1) publication before the Supreme Court set a date to decide whether or not to grant his petition for certiorari; (2) exclusion of certain content unless Bond conferred "express permission" to include it, Am. Compl. ¶ 36; (3) exclusion of "anything which encroached upon the subject matter of the plaintiff's 'life story,'" *id.* at ¶ 35; and (4) a focus on Bond's "legal battle." *Id.* at ¶ 33. On at least two occasions, according to Bond, Roig-Franzia agreed to these terms orally. Bond contends that Roig-Franzia breached this contract when he published content that did not resemble the story that Bond expected and agreed to. According to Bond, as a result of this alleged breach, he suffered harm in the form of diminished value of his life story and emotional pain and suffering. The Post counters that no contract was formed and that Bond has failed to plead facts amounting to cognizable contract damages from the alleged breach. Again, the Post has the better argument.

It is axiomatic that "[a] court cannot enforce a contract unless it can determine what it is." *Strauss v. New Mkt. Global Consulting Grp., LLC*, 5 A.3d 1027, 1033 n.3 (D.C. 2010). "Reasonable definiteness in the essential terms of a purported contract must . . . be a precondition for its enforceability, for otherwise the court has no adequate means of identifying the obligations which it should enforce." *Rosenthal v. Nat'l Produce Co.*, 573 A.2d 365, 370(D.C. 1990). Specifically with regard to oral contracts, the terms are defined by both an agreement as to all the material terms and an objective manifestation of the parties' intent to be bound by the oral agreement. *See New Econ. Capital, LLC v. New Mkts. Capital Grp.*, 881 A.2d 1087, 1094 (D.C. 2005) (citing *Jack Baker, Inc. v. Office Space Dev. Corp.*, 664 A.2d 1236, 1238 (D.C. 1995)). These two requirements are "closely intertwined because even if the parties

intend to be bound by an agreement, the court must be able to determine the terms of the agreement before it can enforce them." *Strauss*, 5 A.3d at 1033.

From the facts that Bond presents, the Court cannot discern the material terms of an enforceable oral contract. The alleged terms are indefinite at best and mutually exclusive at worst. It is unclear what would constitute encroachment upon the "subject matter" of his life story, much less what it would mean to "feature his legal battle." Am. Compl. ¶¶ 33, 35. More fundamentally, on the facts presented, it is not clear how Roig-Franzia could be simultaneously bound to both terms. A description of Bond's legal battle necessarily entails the discussion of parts of his life story. Indeed, the actions before the Supreme Court on which he wished Roig-Franzia to focus were based on discrimination claims linked to his juvenile record. A contract cannot be binding when the party seeking to enforce it fails to prove the material terms that are "necessary for the parties to understand how they are expected to perform the contract itself." *Strauss*, 5 A.3d at 1033 (quoting *Duffy v. Duffy*, 881 A.2d 630, 636 (D.C. 2005)). At this stage in the litigation, Bond is not required to furnish detailed factual allegations, but he must present sufficient factual matter to state a plausible claim. *See Iqbal*, 129 S. Ct. at 1949. On the facts Bond presents regarding the terms of his alleged agreement with Roig-Franzia, the Court finds no facts indicating that a contract existed, even when such facts are liberally construed in Bond's favor due to his *pro se* status, *see Erickson*, 551 U.S. at 94.

Even if other terms that Bond seeks to enforce were discernable (e.g., a publication deadline and exclusion of certain content not related to the legal battle), Bond has not presented any facts that tie the alleged breach of these terms to damages cognizable under contract. Damages for emotional harm stemming from any breach is not recoverable under District of

Columbia law.  *See Asuncion v. Columbia Hosp. for Women*, 514 A.2d 1187, 1190 (D.C. 1986).

The only economic harm that Bond avers in his complaint is a diminishment in the value of his life story as a result the Post's inclusion of certain content in the article, but these terms (or the exclusion thereof) were not part of any contract for the reasons stated above.[15]  Moreover, Bond has not stated plausible facts indicating that the content discussed in the article diminished the value of his life story or resulted in any other economic harm.[16]  The Court acknowledges that, if

---

[15]    Bond also suggests in his opposition memoranda that the value of his website was diminished.  He fails to plead this form of economic harm in his amended complaint and does not include it in his proposed second amended complaint.  As discussed above, *see supra* n.1, the Court cannot rely on factual allegations made outside the pleadings when ruling on defendants' motion to dismiss because reliance on such facts would, under Rule 12(d), require conversion of the motion to a motion for summary judgment.  *See* FED. R. CIV. P. 12(d).  On these grounds alone his pleadings fail to state a claim upon which this Court can grant relief.  Nevertheless, even if Bond had included these allegations in the proposed amendment to his complaint, the amended pleadings would not withstand a motion to dismiss because Bond's conclusory allegations of economic loss, absent plausible facts, fail to state a claim upon which relief can be granted.  FED. R. CIV. P. 12(b)(6).  And even if the Court were to apply a summary judgment standard, Bond would not prevail for the same reasons: at bottom, Bond has failed to present facts demonstrating that the alleged contract breach diminished the value of his website.

[16]    As well, Bond's allegations of promissory estoppel do not constitute a claim upon which relief can be granted.  Under this theory, he asks the Court to order the Post to print a favorable article, return any photographs taken of him, and grant him copyright ownership of the article.  Under District of Columbia law, "[p]romissory estoppel is recognized . . . as a theory allowing recovery in contract when there may have been a failure of proof of certain elements necessary to the formation of an express contract . . . if a refusal to enforce a promise admittedly made would in the circumstances (usually reliance) result in injustice."  *Fed. Ins. Co. v. Thomas W. Perry, Inc*., 634 F. Supp. 349, 352–53 (D.D.C. 1986) (emphasis added); *see also Kauffman v. Int'l Bhd. of Teamsters*, 950 A.2d 44, 49 n.7 (D.C. Cir. 2008) (finding that the theory of promissory estoppel may be invoked only when 'injustice otherwise [would] not [be] avoidable.'") (citing *Bender v. Design Store Corp*., 404 A.2d 194, 196 (D.C. 1979)).  Promissory estoppel is "an inherently equitable doctrine."  *Moss. v. Stockard*, 580 A.2d 1011, 1035 (D.C. 1990).  "Though the promise required for a promissory estoppel claim 'need not be as specific and definite as a contract, it must still be a promise with definite terms.'"  *Vila v. Inter-Am. Inv. Corp*., 570 F.3d 274, 287 (D.C. Cir. 2009) (citing *In re U.S. Office Products Co. Secs. Lit*., 251 F. Supp. 2d 77, 97 (D.D.C. 2003)) (emphasis omitted).  For the reasons discussed in this section, the terms of the alleged promise are not sufficiently clear to warrant the equitable relief.  Bond may feel wronged by the Post's publication of the article, but the Court finds the relief he seeks unwarranted under this equitable doctrine.

the facts alleged in Bond's complaint are true, Roig-Franzia may indeed have violated

journalistic standards (i.e. by publishing content he agreed would remain off the record).

However, Bond cannot recover for the harm he alleges under contract. Accordingly, the Court

concludes that Bond has failed to state a breach of contract claim.[17]

### 4. Bond Fails to State Cognizable Negligent Misrepresentation and Fraud Claims

In addition to defamation, IIED, and breach of contract, Bond alleges negligent

misrepresentation and fraud against the Post. The same fatal shortcoming that bars his breach of

contract claim applies here: failure to present plausible facts demonstrating economic harm. As

with contract damages, economic harm is an essential element of negligent misrepresentation

and fraud claims. *See Osbourne v. Capital City Mortg. Corp.*, 727 A.2d 322, 324 (D.C. 1999).

Emotional harm is not recoverable. *Id.* To survive a motion to dismiss, Bond must therefore

plead "more than a sheer possibility" of the Post's misconduct and assert facts that allow the

Court to draw a "reasonable inference" that the Post misstated a material fact and that this

misstatement harmed Bond economically. *Iqbal*, 129 S. Ct. at 1949. As the Post cogently

---

[17]     The Court acknowledges that whether or not the reporter-source relationship can ever give rise to an enforceable contract is an open question. In this Circuit, one court has held that a contract to keep a source's identity confidential does not lie between reporter and source. *Steele*, 130 F. Supp. 2d at 31–32. The court reasoned that "because a reporter's promise of confidentiality is a moral obligation, not a contractual requirement, and because a moral obligation does not give rise to express or implied contractual duties, there is no contractual relationship" between source and reporter. *Id.* at 31. This holding is based on principles advanced in an earlier decision of the Minnesota Supreme Court that also declined to find such a contract, in part, because "[t]o impose a contract theory on this arrangement put an unwarranted legal rigidity on a special ethical relation." *Cohen v. Cowles Media Co.*, 457 N.W.2d 199, 203 (Minn. 1990). Because these cases are not directly on point here (the alleged contract between Bond and Roig-Franzia dealt with the content of the article, not the disclosure of Bond's identity) and because the Court finds no contract, it declines to examine whether a contract can ever form between a reporter and a source with regard to the content of a story.

argues, Bond presents no such facts in his complaint. Instead, he merely state in conclusory fashion that the value of his life story diminished. Even if misrepresentations of material fact did occur, this Court cannot reasonably infer that such conduct caused Bond any economic harm.[18] Therefore, finding no claim upon which relief can be granted, this Court must dismiss Bond's negligent misrepresentation and fraud claims.

**5.      The Court Dismisses Bond's Negligent Supervision Claim**

Against the Washington Post alone, Bond alleges negligent supervision of Roig-Franzia, contending that the company "was negligent in supervising their employee . . . and even when they were alerted to his unethical and fraudulent acts . . . did nothing to right the wrong committed by the misuse of their paper." Am. Compl.¶ 102. To withstand dismissal, Bond's complaint must present facts that suggest the Washington Post knew or should have known that Roig-Franzia "behaved in a dangerous and otherwise incompetent manner" and that the Post failed to adequately supervise Roig Franzia, armed with that actual or constructive knowledge. *See Giles v. Shell Oil Corp.*, 487 A.2d 610, 613 (D.C. 1985). Once again, as the Post argues, Bond's complaint falls short. Bond fails to allege that the Post knew of any dangerous or incompetent behavior during the time that Roig-Franzia and Bond were corresponding. The only conduct described in the complaint is the failure of the ombudsman to generate a correction on the part of Roig-Franiza after the May 31, 2009 article was published. Such conduct does not amount to inadequate supervision, and, more fundamentally, Bond does not allege any action on

---

[18]      Even if the Court were to look beyond Bond's complaint to the facts presented in his opposition memoranda and convert the motion to a summary judgment review, see *supra* n.15, his claim would nonetheless fail. Although Bond assigns a range of estimated values to his "life story" in his opposition memoranda and contends that the "damage done" would have to be determined by "outside experts," Pl.'s Opp'n to Post at 15, these do not present a genuine issues of material fact sufficient to warrant summary judgment.

the part of Roig-Franzia that occurred after the ombudsman was on notice of Bond's concerns.[19]

Therefore, Bond's complaint thus fails to state a negligent supervision claim.

6. **Bond's Allegations of Civil Rights Violations Fail to State a Claim**

Bond avers that the Post violated his civil rights under the "federal civil rights act" when it published allegedly confidential information about Bond that an Ohio state official shared. Am. Compl. at 3. The Court agrees with the Post that this allegation fails to state a claim upon which relief can be granted because Bond has not alleged state action or action taken by the Post under color of state law, which are essential elements of any civil rights claim. *See, e.g.*, *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999).

7. **The Court Denies Bond's Motion to Amend His Complaint With Respect to the Post**

Bond's proposed second amended complaint contains no changes to his claims against the Post. A proposed amendment is futile if it "merely restates the same facts as the original complaint in different terms." *Robinson*, 211 F. Supp. 2d at114 (citing 3 MOORE'S FED. PRAC. 3d § 15.15 (3d. ed. 2000)). Therefore, on this basis, the Court denies Bond's motion to amend his complaint a second time with respect to the Post.

## IV. CONCLUSION

For the foregoing reasons, the Court concludes that defendants' motions to dismiss [Dkt. ##10, 24] should be granted and Bond's motions to strike [Dkts ## 13. 25] and to file a second amended complaint [Dkt. #26], should be denied. An appropriate order accompanies this

---

[19] Under a theory of respondeat superior, Bond asks the Court to find the Post derivatively liable for the alleged conduct and resulting harms described in his counts against Roig-Franzia. The Court has already determined, however, that Roig-Franzia's conduct does not give rise to any primary liability. Without any primary liability, there can be no derivative liability. *See Steele*, 130 F. Supp. 2d at 37.

memorandum opinion.

Signed on December 6, 2011 by Chief Judge Royce C. Lamberth.